### Ozias W. Shipman v. Charles T. Seymour.

*Purchases made in contemplation of insolvency.*

A case will not be remanded because of the admission of immaterial evidence that could not have affected the issue.

A merchant who had sold goods to a firm just before its failure claimed to have relied on the assurance of a partner that their assets exceeded their liabilities. It was shown that when the vendor's agent had asked one of the firm how he reconciled this assurance with the failure, the latter said something about having lost a good deal of money in a series of years in failures. *Held* that even though this answer may not have been material, its admission was harmless.

An agent sold goods to a firm just before its failure. He claimed to have relied on their assurance that their assets exceeded their liabilities. He had taken notes for goods sold them fifteen months before the failure, and had extended the notes from time to time, and during this period he had offered to sell them other goods which they declined. *Held* that evidence of what they said to him on those occasions was inadmissible to show that he had not relied upon their assurance in the sale last made; it was *prima facie* mere hearsay, and did not tend to throw light upon the later conduct of the parties.

An agent was instructed to inquire into a customer's credit and to sell to him if he was satisfied with his answers. He sent an order to his principal without communicating the answers, and the order was filled. *Held* that the principal had a right to assume that the inquiries were made and that the answers were satisfactory to the agent before he sent the order.

In an action involving the good faith of a firm in buying goods just before they failed, a written answer to an inquiry by the vendor

as to their credit, which though true in fact was false in spirit and tended to mislead, was admissible in evidence.

Any purchase obtained by false representations as to solvency made by a firm within a period before its failure equal to the period of credit usually allowed to it upon its purchases, may be shown as bearing on the question whether another purchase made within that period was fraudulent or not, in contemplation of insolvency.

No inference of fraud can be drawn from the fact that money not yet due remains unpaid, but there is no error in admitting testimony that the purchase price of goods purchased by means of a falsehood, is still unpaid.

It is an act of bad faith for a mortgagee to withhold from record a mortgage given him by a debtor in order to shield the latter from demands that have been contracted in ignorance of its existence.

When the good faith of a mortgage is in question, the time when it was filed and the use afterwards made of it, may be shown.

A purchase made by one who is insolvent and with the purpose not to pay, is void even though the buyer has not made false representations.

Error to Superior Court of Detroit. Submitted January 14 and 15. Decided January 28.

REPLEVIN. Plaintiff brings error.

*Griffin & Dickinson* for plaintiff in error.

*Geo. Gartner* and *F. A. Baker* for defendant in error.

COOLEY, J. Plaintiff in error is assignee of the copartnership of Wilson Bros., composed of George B. Wilson and Frank B. Wilson, recently doing business in Detroit. The assignment is a general assignment for the benefit of creditors, and bears date January 18, 1878. Seymour, the defendant in error, is named in the assignment as one of the creditors of Wilson Bros., and this suit is replevin to recover the possession of certain goods purchased by them of him shortly previous to the assignment, and which he claims were bought with knowledge on their part of their insolvency, and with the intention not to make payment.

It was shown on the trial that Wilson Bros. com-

menced doing business in November, 1872, with a capital
of $9,000.   The inventories made by them at the begin-
ning of each year showed the following results: January
1, 1874, excess of assets over liabilities, $8,333; January
1, 1875, ditto, $13,824;  January 1, 1876, ditto, $4,118;
January 1, 1877, excess of liabilities over assets, $2,964;
January 1, 1878, ditto, $10,541, of which assets $7,932 was
stock and fixtures, and $5,189 accounts.  Previous to April
12, 1877, Calvin Graves, the grandfather of the brothers,
had loaned to them $8,000, all but $1,000 of which then
remained unpaid.   On that day they executed to him a
chattel mortgage of all their stock in trade, fixtures and
furniture, which was made to cover "also all other goods,
chattels and personal property which may hereafter be
added to or substituted for said stock of goods and per-
sonal property or any part thereof, or mingled therewith."
On the execution of this mortgage, Graves advanced to
the mortgagors $2,000 more, making the debt to him
$9,000, and the mortgage was conditioned for the pay-
ment of this sum with interest within one year, and also
of the further sum of $1,000, should Graves advance
that further sum to them as was then contemplated.
This mortgage was not filed with the city clerk until
January 16, 1878.   It was conceded on the trial that it
was purposely kept from the files for two months lest it
might be affected by the operation of the bankrupt law
in case the co-partnership should become bankrupt, and
it was claimed that the failure to file it earlier after the
expiration of the two months was due to an oversight,
and was not intentional.

One Watson was the agent of defendant in error in
making sale of the goods in controversy.   He testified
to being in Detroit December 13, 1877, with samples of
tobacco which he exhibited to George B. Wilson.   He
also asked George B. Wilson whether the assets of the
firm exceeded their liabilities, and was told in reply that
they did.   The next morning the firm ordered of him
ten bales of tobacco of a particular sample, five bales

to be shipped at once, and five bales about January 1, 1878. Watson testified that he would not have made this sale but for the representation of George B. Wilson respecting their pecuniary circumstances. Wilson's evidence was given respecting these transactions, and the tendency of it was to show that what was said in reference to the assets of the firm was made in advance of any careful examination, and was a casual remark while the parties were walking together in the street. The ten bales of tobacco were ordered by Watson from his principal in New York by letter, and these were the goods replevied in this suit. One of the bales had been worked up before the assignment was made, and nine then remained on hand.

I. On the trial Watson was a witness for Seymour, and was allowed under objection to state that he learned of the assignment on the evening of January 18, 1878; that he saw George B. Wilson the next morning and asked him how he reconciled his failure with the statement of their affairs made by him some thirty days before; that Wilson did not respond to the inquiry, but made some remark about having lost a good deal of money in a series of years in failures. It is complained that by this evidence the admissions of the assignors made after they had parted with all control, were brought into the case to affect their assignee.

It is a little difficult to understand the object of plaintiff in insisting upon putting this evidence into the case, or how the defendant could suppose he was prejudiced by it. What Wilson said was no admission of fraud, and tended rather to present a valid excuse than to show dishonesty in his failure. Perhaps it would have been wiser for the judge to exclude this conversation, but we cannot consent that parties shall be put to the expense of another trial merely because the judge permitted the introduction of immaterial evidence where it is plain it could not have affected the issue. *Comstock v. Smith*, 20 Mich., 345; *Continental Insurance Co. v.*

*Horton*, 28 Mich., 173.   We sit here to correct substantial errors, not to rectify those which are harmless, and we cannot ignore the fact that the trial judge must dispose of questions of the admissibility of evidence under many embarrassments, and that these would be increased instead of diminished if in the court of review his decisions even on what prove to be immaterial matters should be subjected to nice and technical criticism.   In this case we find no reason for a suggestion that his ruling harmed any one; and we dismiss it without further comment.

II.   On the cross-examination of Watson it was shown that Seymour had sold Wilson Bros. goods in October, 1876, and taken notes therefor which had been extended from time to time; that Watson called upon them in May, July and September, 1877, and offered to sell them goods, but they did not then buy of him.   Defendant then put to the witness questions as to what was said by Wilson Bros. to him on these occasions; but the questions were overruled.   It is claimed that this ruling was erroneous; that the answers might have tended to show that Watson did not rely upon what was said to him by George B. Wilson in December in making the sale to the firm at that time, but upon his general confidence in the firm arising from former dealings, offers to deal which were declined, etc.   It is easy to suggest the possibility of something having been done or said at these former meetings that might have had some bearing on the present controversy, but the defendant at the trial made no distinct offer of evidence that would be important, and *prima facie* the statements made by Wilson were mere hearsay, and for that reason wholly inadmissible.   If Watson then offered to sell to the firm on credit, the offer showed his confidence; if the Wilsons then declined to purchase, the fact was some evidence that at that time they had no purpose to defraud; but their statements then made to Watson are *prima facie* not admissible, because they could not have tended to

throw light upon the conduct of either party in new dealings two months later.

III. Watson was permitted to testify under objection, that Seymour's instructions to him, under which he made the sale in December, 1877, were to make special inquiries of Wilson Bros. and of others in Detroit before he sold them any goods, and if he was satisfied with the statements made and with the answers to his inquiries, then to sell them a bill of goods. It is said that this evidence was immaterial, because it appeared that Watson did not communicate to Seymour the result of his inquiries when transmitting the order for the ten bales of tobacco, or at any other time, and 'consequently Seymour could not have been influenced by them. But we think Seymour had a right to assume that Watson obeyed his instructions, and that the answers had proved satisfactory before he consented to transmit the order. The fact that Seymour sent goods in compliance with the order would not be evidence that Wilson Bros. made any representations whatever to Watson; but the representations are proved independently, and his sending the goods only shows that he assumed the existence of facts which the independent evidence establishes.

IV. December 28, 1877, Seymour addressed a letter to Wilson Bros. in which he stated to them that he had been informed that they had given to Mr. Rothschild, or the concern of which he was a member, a judgment for several thousand dollars, which had not been recorded, and inquiring in confidence if this was true. Two days later Wilson Bros. replied, expressing indignation at the report, protesting that it is hard to have to fight for their credit against unknown enemies, and declaring that they "can truly say that neither Sigmund [Rothschild] or his firm, or any one belonging to his firm ever had any judgment or mortgage against" them. The reception of these letters in evidence was objected to. The purpose in proving them was to show fraud. It is truly said that the letter of Wilson Bros. was strictly accurate

in its statements, but the deduction that being accurate
it could not tend to show fraud is one depending on
subtleties with which courts and juries cannot trouble
themselves. It is true that Rothschild had no mortgage;
but Wilson Bros. must have known that the purpose of
Seymour's letter was not to ascertain the fact of a par-
ticular demand or encumbrance, but whether any existed
which rendered his demand insecure. He named what
had been told to him, and did not name any other
because none other had been mentioned; but an honest
man replying to his letter would have met its purpose by
giving the information that though Rothschild had no
unrecorded judgment, Graves did have an unrecorded
mortgage, which covered their whole stock, and which,
as they must then have known, rendered them wholly
irresponsible. We think these letters were very impor-
tant, and it would have been singular indeed if the jury
could have reconciled the letter of Wilson Bros. with .
commercial integrity.

V. Plaintiff was permitted to prove by one Giddings
that in October, 1877, he sold a bill of goods to Wilson
Bros. in reliance upon representations made by George
B. Wilson that the firm could pay two dollars for every
dollar they owed, and that the bill still remained unpaid.
As no such representations could truthfully have been
made at that time, the natural inference would be that
the purchase from Giddings was fraudulent, and this
might strengthen the inferences of fraud deducible from
the transactions with Watson in December. It is said
that the transaction with Giddings was too remote to
have any legitimate bearing. It was remote in point of
time some two months, but if the sale was made on the
same credit which was given by Seymour, the bill would
not have fallen due when the assignment was made.
As the time of credit is not mentioned by Giddings, it
is perhaps reasonable to assume that the sale was on
what Watson at one place in his evidence speaks of as
the "usual terms," namely, at four months. The posi-

tion of the case would then be this: Wilson Bros., being largely insolvent, and having previously given a mortgage to their grandfather upon their stock and fixtures to more than their present value, make an assignment for the nominal benefit of creditors. Within the preceding three months they had made purchases on untrue statements respecting their circumstances and upon a credit which had not expired when the assignment was made. Is not the inference a forcible one that these purchases were made in pursuance of a general purpose to defraud their creditors for the benefit of the security to their relative, and can any transaction be too remote which is accomplished within the period of credit, and by means of the same representations which effected the others?

That evidence of transactions about the same time as the one in controversy is admissible, is not disputed; *Rowley v. Bigelow,* 12 Pick., 307; *Hall v. Naylor,* 18 N. Y., 588; and this does not mean that they shall have occurred on the same day or within the same week. The nature of the transaction must have much to do with the question of time, and it cannot be said as matter of law that one month or two months is too remote. In a case like the present it is obvious that the time of credit would be a most important circumstance in its bearing upon the question of a common purpose in the purchases; and we think the court did not err in deciding to receive the evidence. It is true that if the bill was not yet due, no inference of fraud could be drawn from the mere fact of its remaining unpaid; but there was no error in suffering the witness to state that the purchase price of goods purchased by means of a falsehood was still owing.

VI. The plaintiff in the court below made much use of the fact that the chattel mortgage to Graves was kept off the files until two days before the assignment was made. He did not dispute that Graves had let Wilson Bros. have moneys to the amount specified in the mortgage, but his theory of the case was that the moneys were a gift to the grandsons, and that the mortgage was

40 MICH.—36.

taken and kept on foot secretly, and only as a means of protecting the firm against the demands of creditors. To strengthen this theory he gave evidence that after the assignment Graves foreclosed his mortgage, bought in the property, and at once turned it over to Wilson Bros. who went on in business as "Wilson Bros., *agents.*" The theory of the defense was that Graves took and held the mortgage in good faith, but did not intend to enforce it so long as Wilson Bros. appeared to be doing a successful business, and that his grandsons expected he would never enforce it, though he had a legal right to do so at any time. On this theory the defense explain some of the representations of Wilson Bros. respecting their circumstances, which might be true if the mortgage to Graves had not been a liability against them, but would have been false if it was. This may have been a theory satisfactory to the consciences of these young men, but it cannot satisfy the demands of the law. Graves, though he may have advanced to his grandsons all the moneys mentioned in his mortgage, had no moral right to hold the unrecorded security as a means of protecting the mortgagors against demands which were being contracted in ignorance of its existence, and in favor of creditors whose equities would be greater than his, because their demands would accrue without knowledge of a claim which he, in good faith to them, ought to have put upon record, and in reliance upon deceptive appearances which he assisted the debtors to hold out to the world.

The question of the *bona fides* of the mortgage to Graves was fairly in issue on the trial, notwithstanding its consideration was not disputed, and the court was right in permitting the time of filing to be proved, as well as the use afterwards made of it. No error was committed on this part of the case of which the defendant had any just cause of complaint. If the jury had inferred from all the evidence that the Graves mortgage was taken and kept on foot for the benefit of the mort-

gagors themselves, the inference would scarcely have done the parties any injustice under the facts as they are made to appear by their own evidence.

VII. The main question discussed in the case was whether a purchase made when the purchaser knows he is insolvent, and with the preconceived purpose not to pay, is void, even though there may not have been, at the time of the purchase, any fraudulent representations. We are referred by plaintiff in error to Pennsylvania decisions which negative the proposition. *Smith v. Smith*, 21 Penn. St., 367; *Backentoss v. Speicher*, 31 Penn. St., 324. But there is an overwhelming weight of authority the other way. *Donaldson v. Farwell*, 93 U. S., 631; *Powell v. Bradlee*, 9 Gill & J., 220; *Thompson v. Rose*, 16 Conn., 71; *Ayres v. French*, 41 Conn., 142; *Nichols v. Michael*, 23 N. Y., 264; *Hennequin v. Naylor*, 24 N. Y., 139; *Devoe v. Brandt*, 53 N. Y., 462; *Wright v. Brown*, 67 N. Y., 1; *Dow v. Sanborn*, 3 Allen, 181; *Holbrook v. Connor*, 60 Me., 578; *Bishop v. Small*, 63 Me., 12; *Stewart v. Emerson*, 52 N. H., 301; *Ferguson v. Carrington*, 9 B. & C., 59; *Ex parte Whittaker*, L. R., 10 Ch. App., 446.

We think no injustice was done to plaintiff in error on the trial, and the judgment must be affirmed, with costs.

The other Justices concurred.