HERMAN D. ZUCKER, HERMAN KOHN, AND HENRY D. HORWITZ v. SAMUEL KARPELES ET AL.

*Practice in circuit court—Opening case to jury—Special questions —Fraudulent purchase—Rescission—Good-faith mortgagees —Right of possession—Equity jurisdiction.*

1. In opening a case to the jury, counsel should not enter into a detailed statement of the testimony by which he expects to substantiate the facts of his case, but only call attention to the salient points, without repeating the evidence by which he expects to prove them; the object being to assist the jury to understand the testimony as introduced, and its bearing upon the issues involved; citing *Fosdick v. Van Arsdale*, 74 Mich. 304, 305.[1]

2. There is no rule of practice prohibiting an attorney from

[1] See *People v. Montague*, 71 Mich. 448; *Campbell v. City of Kalamazoo*, 80 Id. 656 (head-note 5).

requesting a witness to repeat on cross-examination his direct testimony upon a particular point; nor is it a sufficient reason for refusing to permit cross-examination respecting what has been testified to that the witness has already testified upon that subject.

3. How. Stat. § 7606, as amended by Act No. 15, Laws of 1885, providing for the submission of special questions to the jury, is construed as follows:

a—It is error to refuse to submit such questions if proper in form and substance.

b—There can be no objection to the submission of the questions by the court to the opposite counsel for inspection, who has the right to frame questions, and to have the jury instructed to answer them if they find a general verdict against his client.

c—Counsel are not obliged to furnish special questions until after the arguments are closed, but if they do so there is no reason why the questions should not be discussed to the jury if they relate to the merits of the controversy.[1]

4. The failure of a vendee who knows that he is insolvent to disclose that fact to the vendor will not make the purchase fraudulent, unless coupled with an intent at the time of the purchase not to pay for the goods; citing *Shipman v. Seymour*, 40 Mich. 274, 283; *Garbutt v. Bank*, 22 Wis. 384; *Nichols v. Pinner*, 18 N. Y. 295.

5. Representations made by a merchant to a commercial agency as to the amount of his indebtedness, but not as to his assets, and not shown by any competent testimony to have been communicated to or relied on by vendors from whom he orders goods five months afterwards, have no tendency to prove an intention on his part not to pay for the goods at the time he gave the order.

6. Under the circumstances of this case, the request of the defendants' counsel that "fraud is not presumed, but must be proved, and the burden of proving fraud is upon the person charging it," should have been given to the jury.

7. After the commencement of proceedings to foreclose a chattel mortgage, the consideration for which was in part pre-existing

---

[1] See the following cases bearing upon the construction of this statute: *Pigott v. Engle*, 60 Mich. 221; *Oliver v. Sanborn*, Id. 347 (head-note 7); *Loomis v. Armstrong*, 63 Id. 357 (head-notes 12, 13); *Cook v. Clinton*, 64 Id. 310 (head-note 3); *Miner v. Vedder*, 66 Id. 101; *Thorsen v. Babcock*, 68 Id. 523; *Beecher v. Galvin*, 71 Id. 391; *Transportation Co. v. McMorran*, 73 Id. 467; *Balch v. Railroad Co.*, 78 Id. 654; *Sherwood v. Railway Co.*, 82 Id. 374; *Railroad Co. v. Campau*, 83 Id. 31.

indebtedness due the mortgagees and their promise to pay certain notes on which they were liable contingently as indorsers, and in part cash advanced at the time of the execution of the mortgage, certain of the mortgagor's vendors replevied a small portion of the mortgaged goods, claiming to rescind the contract of sale because of the alleged fraud of the mortgagor in making the purchase, and recovered judgment. It was conceded on the trial that the mortgagees had no notice or knowledge of the alleged fraud, and that the consideration for their mortgage was *bona fide*. And in reversing the judgment the Court hold:

*a*—Where a debtor, for a new and valuable consideration, mortgages goods in his possession, which he has obtained under a contract of sale induced by his fraudulent practices, to a party who is ignorant of such fraud, and who acts in good faith, relying upon the ostensible ownership of the goods by the mortgagor before the defrauded vendor has rescinded the contract, the mortgagee may hold the goods against the title of the vendor, upon the equitable doctrine that, where one of two innocent parties must suffer by the wrongful act or default of another, the loss must fall upon him through whose act or neglect the third party was enabled to commit the wrong.

*b*—The doctrine is an equitable one, and extends no further than is necessary to protect the innocent party in whose favor it is invoked, and in this case only protects the mortgagees to the extent of the cash advanced to the mortgagor; they being already liable on the notes contingently as indorsers, and an executory promise, not changing their situation for the worse, not being such a consideration as will bring them within the protection of *bona fide* mortgagees or purchasers; citing *Dixon v. Hill*, 5 Mich. 404; *Warner v. Whittaker*, 6 Id. 133; *Blanchard v. Tyler*, 12 Id. 339, 342; *Stone v. Welling*, 14 Id. 514, 525.

*c*—It being conceded that the rights of the mortgagees up to the amount of cash advanced were superior to those of the vendors, and they having taken possession of the entire property under their mortgage, which possession was lawful between them and the vendors, if their superior rights could be terminated by after payment, which is not conceded, such payment not having been made, the vendors were not entitled to the possession of the goods at the time they brought suit.

*d*—It is not clearly seen how the rights of the vendors could be worked out and protected in a suit at law, and equity would seem to be the proper forum in which to adjudicate upon and protect the rights of the parties, under whose guidance the goods claimed by the vendors may be identified,

separated, and applied to the discharge of the debt, namely, the new consideration for which they were security, and the surplus handed over to the owners, in case the whole security should be more than sufficient to discharge the debt for which it was pledged.

*e*—It is possible that in some cases, where the new consideration is inconsiderable in comparison with the value of the goods out of which the owner was defrauded, and was money advanced, the defrauded vendor might, by tendering such new consideration to the mortgagee, relieve the property from the operation of the rule before referred to, and entitle him to bring his action therefor in a court of law.

Error to Wayne. (Reilly, J.) Argued October 8, 1891. Decided November 20, 1891.

Replevin. Defendants Heavenrich bring error. Reversed. The facts are stated in the opinion.

*Sloman, Berry & Duffie,* for appellants.

*Griffin, Warner & Hunt,* for plaintiffs, contended:

1. The latitude to be extended to counsel in opening is largely a matter of discretion, which it would be impossible for this Court to regulate unless grossly abused; citing *Scripps v. Reilly,* 35 Mich. 371.

2. The general rule is that a transfer by a fraudulent vendee cannot confer a greater right than he himself has, nor can possession under a wrong-doer rise higher than that of the wrong-doer. The only exception to this rule is in favor of a *bona fide* purchaser for a then valuable consideration paid, and without notice of the infirmity of the transferrer's title; citing 2 Pom. Eq. Jur. §§ 738-751; *Devoe v. Brandt,* 53 N. Y. 462.

3. The settled rule in Michigan is that a *bona fide* purchaser is such only to the extent to which he has parted with his money; that the legal obligation must be irrevocable; that there must be an absolute change of the purchaser's legal position for the worse; and that it is wholly a doctrine of protection, and cannot be supported where the purchaser can be relieved from his obligations.

4. Applying this rule to the appellants, the moment they received back their $300, whether in a specific sum or as part of a larger amount, they could no longer seek protection on the trial by showing that they had made such an advance.

CHAMPLIN, C. J. This is an action of replevin, brought to recover certain merchandise which the plaintiffs claim was purchased by defendant Karpeles, and possession thereof obtained through fraud.

The defendant Karpeles had been, and prior to November 16, 1889, was, a merchant in Detroit, and had been engaged in dealing in ready-made clothing for about six years in that city. During the month of July, 1889, an agent of the plaintiffs, who were doing business in the city of Cleveland under the name of Zucker, Kohn & Horwitz, solicited an order for goods from the defendant Karpeles. One of the plaintiffs, Mr. Zucker, was present when the order was taken. It is not claimed that any representations whatever were made by defendant Karpeles when the order was taken, but it is claimed by plaintiffs that the order was filled by the firm at Cleveland in reliance upon a report representing the financial standing of Karpeles made by Dun & Co.'s commercial agency February 6, 1889, which it is claimed they obtained at Cleveland from the commercial agency before the goods were shipped in August, which report it is also claimed contains an untrue statement of Karpeles' financial standing. The goods were shipped as follows: August 20, 1889, $845 worth; September 19, $175 worth; September 25, $161 worth; and on October 8, $20 worth.

The defendants Heavenrich Bros. are a firm also doing business in the city of Detroit, and it appears that on the 16th day of November, 1889, defendant Karpeles was indebted to them in the sum of $3,238.75, evidenced by four promissory notes, three of which had matured in the early part of the month of November, and one, for $1,215.75, would mature 60 days after October 3, 1889. Defendant Karpeles also owed them $350 for a check dated November 13, 1889, which they had exchanged with

him for his accommodation. They were also indorsers upon his paper for notes held by Magnus .Butzel, as executor of the Hess estate, to the amount of $4,500, maturing in December, 1889. It is claimed by Heavenrich Bros. that Karpeles did not protect them against the check which they had loaned to him, and they concluded to demand security for all of his indebtedness to them, and against their liability as indorser for him, and did so, but he refused at first; and when pressed he agreed to give them a chattel-mortgage security, subject to a mortgage which he would give to his brother-in-law, Fechheimer, for $6,168.82, which he claimed .to owe him, and upon condition, as a consideration thereof, that Heavenrich Bros. should then advance him the further sum of $300 in cash, and pay the notes held by Butzel before maturity. Heavenrich Bros. accepted the proposition, and thereupon Karpeles executed a chattel mortgage to Fechheimer and also to Heavenrich Bros. for the indebtedness so claimed to be due to each, respectively, bearing date the 16th day of November, 1889, which was on Saturday. Heavenrich Bros. immediately took possession under their mortgage, and on Monday, the 18th, advertised the goods for sale on Saturday, November 23, 1889. On Monday, the 18th, plaintiffs replevied so many of the goods sold and delivered to Karpeles as they could identify, amounting to about $500 worth. Heavenrich Bros. caused an inventory of the stock of goods to be made, and sold them, pursuant to public notice, to Hudson, of Detroit, at 65¼ cents on the dollar. Mr. Heavenrich stated upon the witness stand that he did not remember the amount at which the goods were inventoried, but the amount received on the sale of them to Hudson was $10,566.30, and that amount, being 65¼ cents on the

dollar, would give the amount at which the goods were inventoried at $16,193 and some cents.

Upon the trial of the cause in the Wayne circuit court the counsel for the plaintiffs in his opening to the jury, among other things, claimed that the goods involved in the suit were obtained by the defendant Karpeles from the plaintiffs at a time when he was insolvent, with the preconceived design not to pay for them, and by means of false representations; that after obtaining these goods he mortgaged them to the defendants Heavenrich and Fechheimer for a precedent debt, and an advance of $300 claimed to have been made by Heavenrich Bros. at the time of taking their mortgage; that upon ascertaining these facts the plaintiffs rescinded the contract of sale, and now claim to be entitled to the goods so obtained from them as aforesaid.

The theory of the defendants Heavenrich, which was presented to the jury, was that Heavenrich Bros. were ignorant of the purchase by defendant Karpeles from the plaintiffs of the goods in question, and that they received the mortgage in good faith and for a valuable consideration, a portion of which was paid to Karpeles at the time of the execution of the mortgage, and that, whether the purchase by Karpeles of the goods from the plaintiffs was fraudulent or not, they were innocent third parties in possession, and had a superior title to that of Karpeles' vendors.

The assignments of error cover questions of practice as well as questions of law. The counsel for the defendants Heavenrich Bros. complains and assigns as error that the court interfered with his opening of the case of the defendants Heavenrich to the jury, and would not permit him to state his defense and the facts which he expected to prove. We have examined the opening of the counsel for the defendants Heavenrich, and we cannot observe

any such abuse of discretion as would justify us in sending the cause back for a new trial on account of the interruptions of the court in the course of his opening to the jury. Certainly it is not permissible for counsel to enter into a minute argument of the facts, and the bearing which they have upon the points of his defense, in opening his case to the jury.

As an instance of what we think was not permissible, we quote a sentence from the opening, at a point where the court interrupted on one occasion. Mr. Sloman, in addressing the jury, said.

"Now, gentlemen, I say to you that we shall claim that it makes no difference under what circumstances Karpeles bought these goods. If at the time Heavenrich Bros. took this mortgage he was owing them, and the next day—"

At this point the court interrupted, by saying to the counsel as follows:

"I do not think that is any part of your opening; that is a question of law. Confine your attention to the facts that you propose to prove."

We do not think it proper for counsel in opening to the jury to enter into a detailed statement of the testimony by which he expects to substantiate the facts of his case. He should call the attention of the jury to the salient points, and what he expects to establish, and not repeat to the jury the evidence by which he expects to prove the points claimed; the object of the opening being to assist the jury to understand the testimony as it is introduced, and the bearing it has upon the issues involved. We think, when counsel confine themselves to these objects, they will find no disposition upon the part of the courts to interfere with their opening. *Fosdick v. Van Arsdale*, 74 Mich. 304, 305.

Error is assigned upon the interruptions of the court,

upon his own motion, while the defendants Heavenrich Bros.' counsel was cross-examining the witnesses introduced by plaintiffs.

One of the plaintiffs, Herman D. Zucker, was introduced as a witness in his own behalf, and on behalf of the firm of which he is a member, and he was examined as to the sale and shipment of the goods to the defendant Karpeles. He was also permitted to testify that his firm sold the goods to the defendant Karpeles relying upon certain representations which they had obtained from the commercial agency. In his direct examination he had testified that the order was taken in July, and that the first shipment was made in August, and later ones in September, and one in October, and that it was not expected that they would ship the goods at once, but from time to time. Upon his cross-examination he was asked:

" *Q.* As I understand you, these goods which go to make up this account were bought in July?

" *A.* No, sir.

" *Q.* Didn't you so state in your direct examination?

" *A.* No, sir.

" *Q.* Didn't you state in your direct examination that the order was taken in July, and the shipment made at different times?

" *A.* I do not remember that I did."

The court here interrupted the counsel with the question:

" *Q.* What is the object of this?

" *Counsel*: I have the right to examine him.

" *Court*: Yes, sir; he did say something about the order not being shipped in July, because he did not have the stuff on hand, or something like that. It was dated August 20. It is already answered."

Exception was taken to the court's remark and to the interruption. Again, further on in the cross-examination of this witness, he was asked by counsel for defendants:

"Will you state just exactly what you said to him, as near as you can, and also his replies, substantially as he gave them?"

This question referred to a conversation which he stated to have had on November 18, in the afternoon, after the goods had been appraised, with defendant Karpeles. The court interrupted the counsel in asking the foregoing question with this question:

"Didn't he state all that this morning? Unless there is something more—"

Here the witness interrupted, and stated:

"I stated it this morning. I stated exactly what I said to him this morning. Whether I am to repeat it or not I don't know."

Counsel for defendants insisted upon an answer to the question.

"*By the Court:* I think not; you need not repeat it. "*Mr. Sloman:* I ask it for the purpose of testing the memory and credibility of the witness."

The court noted an exception. The witness had further stated in the direct examination that in this conversation with Mr. Karpeles he had been referred by him to his attorney, Mr. Douglas, and that he, with his attorney, Mr. Berry, went to call upon Mr. Douglas at his office, and he detailed a conversation which occurred at that interview. The witness was somewhat confused in his statements as to what was said by Mr. Douglas, and whether he heard it spoken or whether Mr. Berry had told him afterwards what Mr. Douglas said. His attention was again called by counsel for the defendants to that conversation, and this question was asked him:

"*Q.* Tell the jury what part of that conversation Mr. Berry told you and what part Douglas told you. "*Counsel for the Plaintiffs, Mr. Griffin:* He said he could not tell.

*"The Court:* I think he has explained it sufficiently.
*"Mr. Sloman:* He has explained it several different ways.
*"The Court:* Then you have the benefit of the several explanations. . Note an exception."

The witness W. G. Pungs was produced on behalf of the plaintiffs, and testified that he was reporter for the commercial agency Dun & Co., and had been since 1872; that he called upon Mr. Karpeles in 1889, as the agent for R. G. Dun & Co., to get a statement from him; that Karpeles did not invite him; that the statement was not in writing,—it was a conversation that he had with him, a verbal statement from him,—and that he made a memorandum at the time, and took it to the office, and put it upon the records. He was asked if he had that memorandum by Mr. Sloman, who objected to the witness stating what the conversation was unless he produced the report that he made at the time the conversation was had, and which he said was then on file at his office. The court overruled the objection, and allowed an exception. He was then permitted to testify what Mr. Karpeles said, and that he sent out a statement embodying the report to their customers all over the country. He stated also that in that conversation the defendant Karpeles said nothing about his assets, and that he did not. make any detailed statement as to his assets. Upon cross-examination the counsel for defendants Heavenrich asked the witness:

"State again just what he said as to his financial condition.
*"The Court:* That I will exclude; he stated it just now.
*"Mr. Sloman:* I ask this question for the purpose of testing the recollection of the witness as regards the particular language used by Mr. Karpeles."

After taking an exception to the ruling, counsel repeated:

"I ask you to state in substance what he said, and what you said in reply.

"*The Court:* That is under the same head. Note an exception. I do not think a cross-examination consists in asking a witness merely to repeat his testimony."

There is more of the same kind, upon which error is alleged in the record, but sufficient appears to enable us to pass upon the merits of the exceptions.

We think the court erred in not permitting the counsel for the defendants to cross-examine the witnesses fully. We know of no rule of practice that prohibits an attorney from requesting a witness to repeat what he has testified to upon a particular point in his direct examination. He has a right to have it repeated, for the purpose not only of testing the recollection of the witness, but of ascertaining whether he makes a statement at variance with what he testified to in chief. Of course it would not be permissible for an attorney to pass through the whole of the direct examination, and ask the witness to repeat it, and such was not the case here. The attorney had not abused his privilege, nor, as it appears from the record, unnecessarily consumed the time of the court in a fruitless attempt at cross-examination. And it is not a sufficient reason to refuse cross-examination respecting what has been testified to by a witness that he has already testified upon that subject. The strict application of the rule applied by the circuit court would prevent counsel from ascertaining the truth of the statements made by a witness by a cross-examination.

The defendants' counsel prepared and requested the court to submit the following special questions to the jury:

"1. Did Heavenrich Bros. advance $300 to Karpeles at the time of receiving the mortgage as a consideration for obtaining the mortgage?

"2. Did Heavenrich Bros. at the time of receiving the

mortgage know that Karpeles had purchased goods or was indebted to plaintiffs?

"3. Did Heavenrich Bros. agree with Karpeles to take up the Hess notes before they were due, in consideration of Karpeles giving them the mortgage?

"4. If you answer 'Yes,' did they know that Karpeles had bought these goods at the time of making such agreement, and the acceptance by them of their mortgage?

"5. Did they pay these notes before they were due?"

The record proceeds:

"The court handed the special questions to Mr. Griffin, who proceeded to argue the same to the jury, and stated to them how they should be severally answered by them, against the objection of Mr. Sloman. The objection was overruled, and an exception taken."

The court, after charging the jury, refused to submit any questions to them, to which ruling counsel excepted. These exceptions raise two questions:

1. Is it proper for counsel to make an argument to the jury upon special questions submitted, and to instruct the jury how to answer them?

2. Is it proper for the court to refuse to submit any questions to the jury which are within the issues to be tried, and proper in form and substance?

Upon the first question, there can be no objection to the questions being submitted to the inspection of the opposite counsel. It is possible that counsel would desire also to frame questions to be submitted to the jury, and he would have the right to do so, and he might request the court if the jury should find a general verdict against his client to instruct the jury to answer such questions. I do not think it is proper for counsel to instruct the jury how to answer such questions. Counsel are not obliged to furnish special questions until after the arguments are closed, but if they do so there is no reason why they should not be discussed if they relate to the merits of the controversy.

Upon the second exception last above noted, the statute[1] is imperative that the court shall submit the special questions to the jury; and if they are proper in form and substance it would be error to refuse to submit them.

It may be remarked here that the third, fourth, and fifth questions were immaterial, and a refusal to submit them to the jury under the issues in this case was not error; and as to the other two special questions no prejudicial error has been committed in this case in refusing to submit them, if the court was correct in his instructions to the jury upon the law of the case, which were as follows:

"On November 16, 1889, defendant Samuel Karpeles executed to the defendant Herman C. Fechheimer a chattel mortgage on his stock at No. 83 Woodward avenue, to secure certain alleged indebtedness mentioned in the mortgage. On the same day, and about the same time, Karpeles also executed to Heavenrich Bros. a chattel mortgage upon the store to secure certain alleged indebtedness stated in that mortgage. Some of this indebtedness was absolute and some was contingent; but, whether absolute or contingent, the defendants Fechheimer and Heavenrich claim to have paid for it. The details of the indebtedness are not important. It is confessed to be for debts existing at the time the mortgages were given, or what is known in law as a precedent debt, except $192, claimed to have been advanced by Fechheimer at the time of the giving of the mortgage, and the four hundred dollar note to Mr. Karpeles, and the two hundred dollar note to Mrs. Grossman for an amount which Fechheimer assumed at the time of the mortgage, and some $300 which Heavenrich Bros. advanced at the time of the giving of the mortgage. So far as the alleged advances are concerned, the evidence of Fechheimer and Heavenrich show that they have been more than repaid for those advances. The precedent indebtedness does not put defendants Fechheimer and Heavenrich in any better position than Karpeles himself stood. They are not

[1] 3 How. Stat. § 7606.

aided in this respect by these advances they have made, because the advances have been repaid by the amount they received on the sale of this property from the foreclosure of those mortgages. The case stands, therefore, at this time, as though Karpeles were still the defendant, as whatever rights the defendants Fechheimer and Heavenrich claim, and their rights thereunder, the mortgage to them does not convey anything which Karpeles himself did not have title to.

"This is my view of the law, gentlemen, and the remaining question for you to determine in this case is whether the goods purchased of the plaintiffs in this case were purchased under such circumstances as warrants the plaintiffs in rescinding the contract and bringing this action of replevin.

"If you find that Karpeles was insolvent at the time he purchased the goods from the plaintiffs, and then knew he was insolvent, and purchased them with a preconceived idea not to pay for them, it was a fraudulent purchase, and the plaintiffs may reclaim their goods; and if he has done so they are entitled to the goods thus reclaimed by the writ of replevin, and your verdict should be in their favor for that amount, provided, as I have stated, that there was fraud in the purchase of the goods in the first instance. If Karpeles was insolvent at the time he purchased the goods, and knew that he was insolvent, and failed to disclose this to the plaintiffs in the case at the time of the purchase, the purchase, under those circumstances, is deemed in law a fraudulent purchase. If he was insolvent, and if he knew he was insolvent, and had no reasonable expectation of paying for the goods when he ordered them, then in law the purchase was a fraudulent one.

"Now, in determining this question, gentlemen, you are to consider all the evidence that has been introduced bearing upon the financial condition of Mr. Karpeles at the time he purchased the goods; what took place at the time of the purchase, and the representations that he made to the commercial agencies; and the fact that, within a short time or a few months after he made the purchase of these goods, he failed for a considerable sum. All of these matters are to be taken into consideration, as bearing upon this claim.

"If your verdict is in favor of the plaintiffs in the case, it will be a general verdict for the plaintiffs and six

cents damages. If you find in favor of the defendants, then it will be for the value of the goods that were taken under the writ of replevin.

"Of course, the opposite of what I have said is also true; that is, if Mr. Karpeles was not insolvent at the time that he purchased these goods in the ordinary course of business, and intended to pay for. them, but through subsequent losses, or something occurring after the purchase of the goods, he was prevented from paying for them, then your verdict should be for the defendants for the amount of these goods taken by the plaintiffs on their writ of replevin, and that is stated to be $530, I think.

"*Mr. Sloman*: Five hundred and twenty, with interest from the time of the taking, making it $568.64.

"*The Court*: Finding for the defendants in this case, as I have said, if you do, your verdict will be for $568.64. That is all I have to say to the jury.

"*Mr. Douglas*: Your honor leaves the requests?

"*The Court*: I will refuse the requests, and refuse to submit any questions to the jury."

The action is replevin, and the issue involves the title of the plaintiffs to the property and their right to its possession at the time the writ was issued. The plaintiffs' claim was that they were the owners of the goods replevied, and were entitled to the immediate possession of them, for the reason that when the defendant Karpeles purchased the goods he was insolvent, and knew himself to be such, and did not at that time intend to pay for them; that they had the right to rescind the contract of sale and reclaim their goods. The defendants Heavenrich Bros. claim that they were innocent mortgagees of the goods covered by their chattel mortgage, and that they stand in the situation and are protected by the rule applicable to *bona fide* purchasers from their vendor, whether he obtained the goods by fraud or not. The counsel for the plaintiffs state in their brief that—

"It may be observed that upon this record there is no question as to the existence of the indebtedness mentioned

in the Heavenrich mortgage, no question as to the advance of the $300 under the circumstances testified to by Heavenrich, and no question at all as to the validity of the Heavenrich mortgage. The facts are assumed to be as Heavenrich states them, leaving the *bona fide* character of the Heavenrich mortgage, as against the defrauded vendors, a mere question of law."

The court held that as the result of the foreclosure showed that defendants had received more than was sufficient to repay them for the money advanced at the time of giving the mortgage, namely, $300, they stood in no better situation than their mortgagor would have stood had the mortgage never been made and the action were against Karpeles alone. To reach this conclusion, he applies the first money received on the sale to the payment of the advance of $300, which had at that time entitled them to protection as *bona fide* mortgagees, and then, as to the remainder of the consideration, it being for a precedent debt, it is not sufficient to preserve their rights as *bona fide* mortgagees for value. The mortgage to Heavenrich Bros. is said to be valid, and no question whatever was made as to the prior mortgage to Fechheimer, to which the Heavenrich mortgage was subject. There is no fraud alleged or charged against Heavenrich Bros. Under the instructions of the court, it must also be conceded that they were innocent mortgagees and for a valuable consideration; that they advanced in good faith $300 to induce Karpeles to execute the mortgage. If this money had not been advanced, they could not have held the goods as against the defrauded vendors. Was this advance a sufficient new consideration to entitle them to the protection of *bona fide* purchasers to the full extent of their mortgage? If the mortgage had been for just $300, and had covered only the goods sold by plaintiffs to Karpeles, it would have been good as against the plaintiffs. Because the mortgage is for more than $300

advanced, and is intended to secure pre-existing indebtedness, it is not for that reason invalid. A creditor has a right to obtain security for the pre-existing debt, but his debtor has no right to mortgage goods not his own to secure such indebtedness. If, however, he has, for a new and valuable consideration, mortgaged goods in his possession, which he has obtained under a contract of sale induced by his fraudulent practices, to a party who is ignorant of such fraud, and who acts in good faith, relying upon the ostensible ownership of the goods by the mortgagor before the defrauded vendor has rescinded the contract, such innocent mortgagee may hold the goods against the title of the defrauded vendor, upon the equitable doctrine that, where one of two innocent parties must suffer by the wrongful act or default of another, that one must suffer the loss through whose act or neglect such third party was enabled to commit the wrong. The doctrine is an equitable one, and extends no further than is necessary to protect the innocent party in whose favor it is invoked. Hence it may be truthfully said that it extends in this case no further than to protect Heavenrich Bros. for the $300 advanced. It does not protect Heavenrich Bros. against the Butzel notes because they promised to pay them before maturity. They were already liable on these notes contingently as indorsers, and an executory promise which will not change their situation for the worse is not such a consideration as will bring them within the protection of *bona fide* mortgagees or purchasers. *Dixon v. Hill*, 5 Mich. 404; *Warner v. Whittaker*, 6 Id.133; *Blanchard v. Tyler*, 12 Id. 339, 342; *Stone v. Welling*, 14 Id. 514, 525; *Wormley v. Wormley*, 8 Wheat. 421.

In the case before us the difficulty lies in applying the principle so as to afford protection to the rights of each of the parties. As before stated, had the mortgage not

covered the goods sold by plaintiffs to Karpeles, the plaintiffs could not have assailed the mortgage successfully. Had it covered only the goods sold by plaintiffs to Karpeles, the plaintiffs could not have assailed the mortgage. All the goods were sold by the mortgagees, the good faith of which sale is not questioned, and such sale failed to produce sufficient to pay the debts secured. There was a deficiency of $3,991.27. The question raised is, does a court of law have any authority for saying to the mortgagee—

"You shall apply the moneys which you received on the sale of the mortgaged goods, first for the payment of the last money advanced, so as to deprive you of your security to that extent for the benefit of the person who enabled your mortgagor to include property in the mortgage which did not belong to him, and which he can reclaim if he sees fit to rescind the contract of sale?"

Does not such application destroy the rule of protection to the *bona fide* mortgagee? The rule is that the mortgage is valid and effectual as against the defrauded vendor; but, under the instructions of the court, it ceases to be valid, and the mortgagee loses his protection, the moment he enforces his security. The rule in equity as to the application of payments is that the debtor may direct when he makes a payment how it shall be applied. If he fails or neglects to do so, then the creditor may make the application, and, if both neglect, then the payment will in equity be applied to the debt first incurred, for the reason that this is presumed to be for the best interests of the debtor; but in cases like this neither law nor equity will favor the defrauded vendor at the expense or injury of the *bona fide* purchaser or mortgagee, whose equities are superior to such vendor. Had there been a surplus realized from the mortgage sale, then other considerations would have arisen, which do not arise in this case.

The main trouble with the plaintiffs' case is that they concede the validity of the mortgage, and that Heavenrich Bros. are *bona fide* mortgagees to the extent of $300. This being so, the rights of Heavenrich Bros., as *bona fide* mortgagees, extended to every part and parcel of the goods covered by the mortgage. They had taken possession of all the goods, and held them by virtue of such mortgage. Their possession · was lawful, and as between plaintiffs and them they occupied the position of *bona fide* mortgagees. If their superior right could be terminated by payment afterwards, which under the facts of this case I do not concede, it was not terminated until payment, and hence plaintiffs were not entitled to the possession of the property at the time suit was brought. This suit was premature; and, indeed, I do not see clearly how the rights of the plaintiffs in cases like this can be worked out and protected in a suit at law. It appears from the record that the value of the plaintiffs' goods included in the mortgage was $500, and that the amount for which the defendants Heavenrich were entitled to protection was $300. Had the property been left in the hands of Heavenrich Bros., there would have been $200 worth of goods which justly belonged to the plaintiffs, if they were defrauded as they claim in the sale of the goods to Karpeles; but there is no way at law in which this surplus can be selected out and handed over to the plaintiffs. Until a sale is made, it cannot be known what the goods would bring, and this $500 worth claimed in this suit may upon a foreclosure have brought no more than sufficient to pay the $300. It seems to me that the proper forum to adjudicate upon and protect the rights of the parties in such a case as this would be in a court of equity, under whose guidance the property claimed may be identified, separated, and applied to the discharge of the debt, viz., the

new consideration for which it was security, and the surplus handed over to the owners, in case the whole security should be more than sufficient to discharge the debt for which it was pledged. There may arise cases where the new consideration for which the security was given was not money. In such cases, in a court of law there would be no criterion to fix the value of such consideration, and a court of equity would be the proper forum. It is possible in some cases, where the new consideration is inconsiderable in comparison with the value of the goods out of which the owner was defrauded, and was money advanced, the defrauded vendor might, by making tender of such new consideration to the mortgagee, relieve the property from the operation of the rule before referred to, and entitle him to bring his action therefor in a court of law.

No exception was alleged or relied upon at the trial upon the ground that the plaintiffs were not entitled to the possession of the goods at the time they sued out the writ, and we should not have reversed the case upon that ground if it had been the only error that we discovered in the record.

It is also claimed by counsel for Heavenrich Bros. that the court erred in his charge to the jury with respect to the main branch of plaintiffs' claim, viz., that the goods were purchased by Karpeles when insolvent and he knew himself to be so, and with the preconceived design not to pay for them. It will be noticed that the court instructed the jury that—

"If Karpeles was insolvent at the time he purchased the goods, and knew that he was insolvent, and failed to disclose this to the plaintiffs in the case at the time of the purchase, the purchase, under those circumstances, is deemed in law a fraudulent purchase."

We think the court erred in this instruction. There

88 MICH.—28.

are some authorities which support the view of the law stated by the court, but the weight of authority is the other way; that it does not render a purchase fraudulent simply from the fact that the purchaser knew at the time that he was insolvent, and failed to disclose that fact to his vendor. It is necessary, in order to make his purchase fraudulent, that he should at the time he purchased the goods intend not to pay for them. The law in this State is laid down in *Shipman v. Seymour,* 40 Mich. 274, 283, and the authorities cited. See, also, *Garbutt v. Bank,* 22 Wis. 384; *Nichols v. Pinner,* 18 N. Y. 295.

We think also that the court erred in stating to the jury that they were at liberty, in reaching a conclusion as to whether the purchase was a fraudulent one, to take into consideration the representations that Karpeles made to the commercial agency. There was evidence introduced tending to show that in February, 1889, he had made a statement to a commercial agency in Detroit of the amount of his indebtedness; but it was not claimed that he made any representations as to the amount of his assets, and it was not shown that these representations, whatever they were, were communicated to plaintiffs, and relied upon by them in making the sale of the goods in question. Some testimony upon that subject was introduced, but it turned out to be entirely hearsay, and was stricken out by the court. It ought, therefore, not to have been considered by the jury as having any tendency to prove the intention of Karpeles in the following July, in giving an order for the goods in question,—that he had formed a preconceived design or intent not to pay for such goods.

The counsel for the defendants Heavenrich Bros. requested the court to charge the jury that—

"Fraud is not presumed, but must be proved, and the burden of proving fraud is upon the person charging it."

The court made no allusion to this in his instructions to the jury. I think the defendants were entitled to have the instruction given, under the circumstances in this case.

For the errors disclosed upon the record the judgment is reversed, and a new trial ordered.

The other Justices concurred.