| 115 | 185 |
| 123 | 316 |

## FRISBEE *v.* CHICKERING.

SALE—FRAUD—EVIDENCE.

F. C., an insolvent, organized the firm of F. C. & Co., with M. and H., who were worth from $50,000 to $75,000, as his co-partners. M. and H. lived in Ohio, and the principal office of the new firm was located in that State. C. continued to reside at G., in Michigan, and conducted business for himself in the name of C. & Co. C. ordered certain merchandise from plaintiffs, a Missouri firm, with whom he had had no prior dealings. The order was signed "F. C. & Co.," and was mailed from G. Plaintiffs, after consulting Dun & Co.'s reports, and finding the firm of F. C. & Co. in the G. list, rated at from $50,000 to $75,000, filled the order. C. disposed of the merchandise, deposited the proceeds to the credit of C. & Co., and refused to pay the purchase price. Plaintiffs sued in an action of deceit. It appeared that C. had been for years a subscriber to Dun & Co.'s reports, that he knew just how the firm of F. C. & Co. was rated, and understood that the rating would secure credit for the firm at the hands of strangers. *Held*, that he perpetrated a fraud in obtaining the merchandise, and in appropriating the proceeds, on the pretense that he was doing business for himself under the name signed to the order.[1]

Error to Kent; Grove, J. Submitted October 14, 1897. Decided December 7, 1897.

Case by Orlando C. Frisbee and others against Frank Chickering for deceit. From a judgment for plaintiffs, defendant brings error. Affirmed.

*More & Wilson*, for appellant.

*T. J. O'Brien* and *James H. Campbell* (*Herbert L. Hunt*, of counsel), for appellees.

---

[1] On the question of fraud in obtaining credit by representations to commercial agencies or otherwise, there is a note to *Childs* v. *Merrill*, (Vt.) 14 L. R. A. 264.

MOORE, J. This cause was commenced by *capias* to recover the value of two car loads of lumber, which plaintiffs claim were fraudulently obtained from them. The case was tried by the court, without a jury. Written findings of fact and law were filed by the judge, and a judgment entered in favor of the plaintiffs. From that judgment the defendant appeals.

It is conceded that the findings of fact justify the conclusions of law, but it is contended by the defendant that there is no testimony in the case upon which to base a finding that he perpetrated a fraud upon the plaintiffs in obtaining the lumber. Prior to 1890, defendant had been engaged in business at Grand Rapids, in his own name, and had failed. In 1889 and 1890 judgments were obtained against defendant for upwards of $25,000, and in 1895 for upwards of $20,000. At the time of the transaction between the parties to this cause, those judgments were outstanding and unpaid. In 1892 the firm of Frank Chickering & Co. was organized. Its office was at Bucyrus, Ohio, and its principal business was near there. The members of the firm were the defendant, who was without means, and Mr. Monnette and Mr. Hull, who were worth from fifty to seventy-five thousand dollars. Mr. Monnette and Mr. Hull lived at Bucyrus, and Mr. Chickering continued to live at Grand Rapids. Mr. Chickering was not obliged to spend all his time with the Bucyrus firm, and he did business for himself at Grand Rapids, in his own name and in the name of Chickering & Co.; and he claims that he did business at Grand Rapids for himself in the name of Frank Chickering & Co.

The plaintiffs were residents of Dexter, Mo., where they were manufacturing hardwood lumber. The latter part of 1895, and early in 1896, the defendant ordered, by correspondence, two car loads of lumber from plaintiffs in the name of Frank Chickering & Co. The parties prior to this had had no dealing with each other. The plaintiffs were subscribers to Dun & Co.'s mercantile reports, and found the firm name of Frank Chickering & Co. rated

in the Grand Rapids list as worth fifty to seventy-five thousand dollars. Relying upon this rating, they shipped the lumber in their own name to Grand Rapids, and sent an order to the railroad company to deliver the lumber to the order of Frank Chickering & Co. The defendant sold one car load of this lumber to the Oriel Furniture Company, and one car load to the Berkey & Gay Company, without taking the lumber into his own possession, further than to indorse the order given upon the railroad company over to them. The two furniture companies paid for the lumber by giving short-time paper, which the defendant discounted, and had the proceeds placed to the credit of Chickering & Co., which he testifies was himself. The defendant did not pay for the lumber, and this suit was brought. Mr. Monnette and Mr. Hull testified that they had no knowledge of the transaction, and had not authorized it, and had received no benefit from it.

Upon the trial, the city directory of Grand Rapids for 1895 and 1896 was received in evidence. It contained the following entries:

"Frank Chickering (Frank Chickering & Co.), H. 257 Madison Ave.

"Frank Chickering & Co. (Frank Chickering, J. C. F. Hull, M. J. Monnette), Hardwood Lumber, 26 Tower Block.

"George Chickering, Student, Boards 257 Madison Ave.

"Chickering & Co. (Frank Chickering), Lumber, 26 Tower Block."

The name of Chickering did not appear elsewhere, alone or in any connection.

The ratings of R. G. Dun & Co. at Grand Rapids were received in evidence. They showed:

"Grand Rapids, Kent County, Mich. Frank Chickering & Co., Hardwood Lumber, D 2.

"Chickering & Co., Lumber, ———."

The rating "D 2" was explained to mean worth fifty to seventy-five thousand dollars. The rating blank was explained to mean no rating. These were the only entries in

relation to any business at Grand Rapids with which Mr. Chickering was connected. No entry was made on these books of this firm in the Bucyrus, Ohio, list. The firm of Frank Chickering & Co. at Grand Rapids did not appear in Bradstreet's reports, and it was shown by the superintendent of Bradstreet's at Grand Rapids that, after the firm of Frank Chickering & Co. came into existence, Mr. Chickering saw the superintendent.

"He met me by accident, and called my attention to the fact that we did not rate the firm of Frank Chickering & Co. at Grand Rapids; that is to say, they were not printed in the Grand Rapids list. And he further stated that 'we are in business in Grand Rapids, doing business here right along.'"

It was also shown that Mr. Chickering had been for 14 or 15 years a subscriber to Dun & Co.'s reports, and, according to his own testimony, he knew as early as 1894 just how the ratings were in Dun & Co.'s reports. The defendant, in his correspondence with plaintiffs addressed them as follows:

"Some time ago you wrote us you could deliver us inch quartered white oak. * * * If you can ship us * * *. [Signed] F. C. & Co."

It is the claim of the defendant that he had nothing to do with the rating in Dun & Co.'s reports, and that all the time from his failure until this transaction he was engaged in business in Grand Rapids in the name of Frank Chickering & Co., and that to keep silent was not a fraud, when he was not inquired of as to his financial standing. It does not appear from positive proof that defendant was responsible for the mercantile reports. It does appear, however, from his examination, that a representative of Dun & Co. inquired of him about the standing of the firm of Frank Chickering & Co., and he referred him to Bucyrus, Ohio, for information. Reference has already been made to his interview with Bradstreet's superintendent.

Mr. Chickering knew the use which was made of these

reports. If it be admitted that he was doing business at Grand Rapids for his sole use, under the name of Frank Chickering & Co., he knew that one of the leading mercantile reports of the country was representing that firm as consisting of Mr. Chickering, Mr. Monnette, and Mr. Hull, and that they were worth a large sum of money. He also knew that this report, so far as it related to the business of Frank Chickering & Co., done for his sole benefit, was untrue, and was calculated to mislead, and might result in the consummation of frauds upon the persons who had a right to rely upon these reports, if they acted upon them. He also knew that there was no report in that list of the firm of Frank Chickering & Co., so far as it related to his sole business, and that, when he did business in the name of Frank Chickering & Co., the subscribers to Dun & Co.'s reports would naturally, and would have a right to, suppose he was doing business, not only for himself, but for Mr. Monnette and Mr. Hull, and that credit extended to the firm would be in the belief that it was extended to a responsible firm. To do business under such circumstances in the name of a responsible firm, for his own use, when he was hopelessly insolvent, was a fraud upon those with whom he did business, and to allow such a transaction to stand would not be very creditable to the courts.

It is true, as claimed by counsel, that in this country a man, although insolvent, may lawfully buy on credit, even if he does not make his financial condition known to the vendor, if, at the time, he intends to pay. *Wright* v. *Brown*, 67 N. Y. 1; *Zucker* v. *Karpeles*, 88 Mich. 413. But if the purchaser knows he is insolvent, and makes the purchase with the preconceived purpose not to pay, the purchase is void, even though there may not have been at the time of the purchase any fraudulent representations. *Shipman* v. *Seymour*, 40 Mich. 274; *Zucker* v. *Karpeles*, *supra*. This was not a case of simply remaining silent when one was under no obligation to speak. The defendant knew, as already stated, that the

firm of Frank Chickering & Co., listed at Grand Rapids, was represented by a great mercantile agency as responsible and entitled to credit, and that this representation would naturally be relied upon when an order was sent in the name of that firm. Under such circumstances, it was his duty to speak when he came to deal with a person who was a stranger to him, and who, by the usual and known methods among business men, would be likely to consult the representation as contained in the mercantile reports. It is said in Cooley on Torts (475-477):

"Fraud is never presumed, and the party alleging and relying upon it must prove it. This, however, is one of those rules of law which is to be applied with caution and circumspection. * * * Fraud is therefore as properly made out by marshaling the circumstances surrounding the transaction, and deducing therefrom the fraudulent purpose, when it manifestly appears, as by presenting the more positive and direct testimony of actual purpose to deceive. * * * In general, mere silence—a mere failure to apprise the party with whom one is dealing of facts important for him to know, for the protection of his own interest in the particular transaction—is no fraud. * * * Therefore, where the sources of information are equally open to both parties to any dealings, and the one obtains an advantage of the other, without resort to any trick or artifice of concealment calculated to throw the other off his guard, or to any false presentation of facts, the advantage he gains is deemed legitimate, and the losing party must bear such loss as has resulted from his own want of vigilance or prudence. * * * Therefore, if one who is insolvent buys goods of another without disclosing his circumstances to his vendor, who is ignorant of them, but makes no inquiries, and is not deceived by misrepresentation or artifice, there is in law no fraud, although the vendor, when he sold, fully believed the vendee to be responsible and entitled to credit. In order to make out deception, it is not essential that false assertions should be made in words. A nod, a wink, a shake of the head, or a smile artfully contrived to induce the other party to believe in a nonexistent fact which might influence the negotiations, may have all the effect of false assertions, and be equally deceptive and fraudulent. So, one may accomplish a fraud by encouraging and taking

advantage of a delusion known to exist in the mind of the other, though nothing is directly asserted which is calculated to keep it up."

When the defendant gave this order for himself in the name of Frank Chickering & Co., he knew just how that company was rated upon the books of the mercantile agency. He knew that rating would be consulted as a rule by the average business man. He also knew that, with such a rating, a firm who were selling upon credit would not be likely to make further inquiries as to financial standing, and would be likely to fill an order for goods at once if the price and terms of payment were satisfactory. It is impossible to read this record without coming to the conclusion that the lumber was fraudulently obtained of the plaintiffs by the defendant. The purchase of this lumber, and the appropriation of the proceeds, under the circumstances disclosed by the record, cannot be justified either in morals or law.

Judgment is affirmed.

The other Justices concurred.