HOFFMAN *v.* LAKE SHORE & MICHIGAN SOUTHERN
RAILWAY CO.

1. SALE—BILL OF LADING—DELIVERY—TITLE.

Where a consignor attaches to the bill of lading a draft at 20
days, which the consignee refuses to honor unless the demur-
rage charges are adjusted by the consignor, and the consignor,
on being advised to that effect, directs the immediate delivery
of the bill of lading, the consignee is invested with title,
which will support a lien for freight charges incurred by
him.

2. SAME — PARTNERSHIP—WITNESSES — COMPETENCY— KNOWLEDGE
OF FACTS.

Where a bill of lading was delivered to the purchaser of goods
by one member of a firm in the absence of another member,
the latter was incompetent to testify in regard to the purpose
for which the delivery was made, since it was impossible for
him to know what purpose his fellow partner had in making
the delivery.

3. SAME—RESCISSION—LIEN FOR FREIGHT CHARGES.

The vendor of goods fraudulently purchased cannot, by rescis-
sion, defeat the lien of a railroad company for freight
charges accruing to it under contract entered into in good
faith with the vendee.

Error to Kalamazoo; Buck, J.   Submitted October 3,
1900.   Decided November 13, 1900.

Replevin by Richard C. Hoffman and John T. Hill, copartners as R. C. Hoffman & Co., against the Lake Shore & Michigan Southern Railway Company. From a judgment for plaintiffs, defendant brings error. Reversed.

*Boudeman & Adams,* for appellant.

*E. A. & Robert B. Crane,* for appellees.

Montgomery, C. J. The plaintiffs recovered in an action of replevin. Defendant brings error. The circuit judge found the facts, and defendant excepted to certain of the findings. As all the testimony is returned, and in essential points undisputed, the material points in the case may be as well understood by a succinct statement of the essential facts as disclosed by the record as by setting out the findings, which are lengthy.

The plaintiffs are dealers in railroad supplies. In April, 1899, one C. H. Lawrence, as a representative of the International Construction Company, opened negotiations with the plaintiffs for the purchase of three car loads of railroad spikes, stating that the construction company intended to make use of them in building the Erie & Cambridge Spring road. On the 7th of May an order for 700 kegs of spikes was given for delivery, to be delivered the latter part of June to the middle of July; "terms, five days' sight draft against bill of lading." By mistake, plaintiffs, having overlooked the date fixed for shipment, ordered the spikes from the manufacturers at once, and on the 12th of May wrote the construction company as follows:

"Referring to your letter of the 7th inst., ordering 700 kegs of spikes, we sent the order into the mill, and, through an inadvertence, the delivery latter part of June or first of July was overlooked, and we are today in receipt of bill lading showing that shipment has been made. We have asked the R. R. Company to stop it, and in the meantime we would like to know from you whether you can receive these spikes now or not. We greatly regret the oversight, and trust you can take them."

The construction company replied that they could not take the spikes except on 20 days' draft. Plaintiffs replied:

"We are in receipt of and thank you for your T. D., stating that you will take the spikes if we will make draft in 20 days. We are very anxious to close this matter out, as we have next to no margin on it, and, as an inducement to do so, we wired you today if you would not accept them at a discount of 1 per cent., a day sight draft at once. We trust you can do this."

To this the company replied on the 20th:

"We cannot use spikes except on terms as made you, viz., 20 days' draft attached to bill of lading."

Plaintiffs on the 23d made draft at 20 days attached to bill of lading. The construction company refused to accept the draft unless the bill of lading should be delivered, and explained their action by letter on the 30th:

"We beg to acknowledge the receipt of yours under date of May 27, 1899, and in reply to same would say we accepted your draft, and the next day the bank messenger returned, saying that the instructions from the Baltimore bank were not to deliver the papers until the draft was paid. You will understand that the demurrage on the three cars of spikes will amount to $6 per day, which will amount to $120, and, with the price of $120 added to the price of the spikes, there would be no economy by purchasing them at your figure. Of course, this is neither here nor there. If you can arrange to hold the spikes in the cars at the point of shipment, or arrange so there will be no demurrage, we have no objections to accepting the draft, and allowing the bill of lading to remain with it until it is paid. Kindly advise us if you can do this, and there will be no trouble about the acceptance or the payment of the draft when due."

To this the plaintiffs replied as follows:

"We are in receipt of your letter of the 30th ult., in regard to the draft attached to the bill of lading. We directed the bank immediately on receipt of your telegram to deliver the bill of lading to you, and we suppose this has been done, and that everything will be all right."

The company then accepted the draft by "E. R. Elmer," received the bill of lading, presented the same to the company and reshipped two car loads of the spikes to Kalamazoo, Mich. The cars came into the possession of the defendant company from connecting lines, and the defendant claims a lien on the spikes for the freight advanced, and for the freight earned by its own services, and for demurrage, amounting to $318. No tender of payment of these charges was made prior to bringing suit.

In addition to the above facts, certain facts were found by the circuit judge which it is claimed the testimony wholly fails to support. These findings are numbered 10, 11, and 16, and are as follows:

"10. That the said C. H. Lawrence, pretending to represent a company styled the International Construction Company, fraudulently represented to the plaintiffs that he desired to unload the spikes from off the cars at Erie, Pennsylvania, to save demurrage, and that to do so it would be necessary for him to have the bill of lading; that on these representations he sought and obtained the same for that purpose only.

"11. That plaintiffs, relying on these fraudulent representations, consented to the bill of lading being delivered to said C. H. Lawrence for the sole purpose of permitting the spikes to be unloaded from the cars at Erie, Pennsylvania, and for no other purpose."

"16. That the plaintiffs never intended to part with the title or possession of the spikes till they were paid for, and that they only consented to the surrender of the bill of lading for the purpose of permitting the spikes to be unloaded at Erie, Pennsylvania."

An examination of the record discloses that the only competent testimony to support these findings is that contained in the correspondence above quoted. We think this evidence does not support the findings. The original shipment was without the authority of the construction company. The proposition to accept the goods on the terms of 20 days' draft attached to bill of lading, and the drawing of the draft in pursuance thereof, did not pass title or the right of possession to the purchaser. *W. &*

*A. McArthur Co.* v. *Old Second Nat. Bank*, 122 Mich. 223 (81 N. W. 92).   But when, on learning that large demurrage charges would be made, the construction company refused to accept the draft, and suggested a new arrangement, the plaintiffs, instead of accepting this proposition, directed the delivery of the bill of lading to the construction company on acceptance of the draft.   The bill of lading was so delivered.   What is the inference? We think it clear that this act manifested an intention of extending credit to the construction company and to pass the title to the property to them.   Mr. Hill, one of the members of the firm, was permitted to testify that the object in surrendering the bill of lading was to permit the construction company to unload the spikes from the cars; but, as the bill of lading was surrendered in his absence by Mr. Hoffman, it is manifest that the witness could not know what purpose his partner had in surrendering the possession of the spikes.   The only competent evidence on this subject was the correspondence, and this shows a delivery to the construction company without reserve.   If, then, we assume that there was fraud in the purchase by the construction company, the question is presented as to whether the plaintiffs, on rescinding the sale for fraud, are entitled to recover the spikes freed of the lien acquired by the railway company.

The plaintiffs' counsel contend that the title to the spikes never passed to the construction company; but, as we have seen, this proposition is untenable, and, this being so, the railway company received the goods from one in whom the plaintiffs had vested title, and, as is conceded, performed services in good faith, and in reliance on the apparent ownership of the construction company.   This case is not different in principle than when the fraudulent purchaser has, before rescission, mortgaged or sold the goods purchased to a *bona fide* third party.   In such case the rule that, where one of two innocent parties must suffer for the wrong of a third person, that one shall bear the loss who has placed it in the power of the wrong-doer to

work the injury, applies.    For cases applying this rule in circumstances analogous to those surrounding this case, see *Zucker* v. *Karpeles*, 88 Mich. 430 ( 50 N. W. 373 ); *Pangborn* v. *Ruemenapp*, 74 Mich. 572 ( 42 N. W. 78 ); *Hoffman* v. *Noble*, 6 Metc. ( Mass.) 68 ( 39 Am. Dec. 711 ).

The lien of defendant should be sustained.    The judgment will be reversed, and a judgment entered in this court in favor of defendant for the amount of the lien, with costs of both courts.

The other Justices concurred.