In the Matter of FEDERAL'S, INC., a Michigan Corporation, Debtor.

No. 72–1933–P.

United States District Court,
E. D. Michigan, S. D.

Aug. 18, 1975.

Herbert N. Weingarten, Detroit, Mich., for Federal's, Inc.

James M. Wienner, Detroit, Mich., for Panasonic.

## OPINION

RALPH M. FREEMAN, District Judge.

The Matsushita Electric Corporation of America (Panasonic) is before this Court seeking review of an order of the Bankruptcy Court which denied Panasonic's right to recover certain merchandise sold and delivered on credit to Federal's, Inc., as against the claim of Federal's receiver. The goods in question were delivered to Federal's just prior to the filing of its Chapter XI petition for an arrangement with creditors.

The case is squarely set forth upon the following stipulated facts:

1. On August 10, 1972 Panasonic delivered goods to Federal's on credit (Net 60 days). These goods were invoiced at a price of approximately $64,000.

2. On August 16, 1972 Federal's filed a petition under Chapter XI of the Bankruptcy Act and a receiver was appointed.

3. On August 18, 1972 Panasonic demanded return of all merchandise delivered to Federal's within the preceding ten days pursuant to the provisions of Section 2–702 of the Uniform Commercial Code.

4. At the time of Panasonic's reclamation demand approximately $60,000 of the goods were still in the possession of the Receiver.

5. Panasonic concedes that Federal's did intend to pay for the goods at the time they were ordered and received.

Section 2–702(2) of the Uniform Commercial Code (UCC) gives a seller the right to reclaim goods delivered to a buyer who was insolvent at the time of delivery if demand is made within ten days of delivery to the buyer. The ten-day limitation does not apply if the buyer has made a written misrepresentation of solvency within three months prior to delivery. However, there is no allegation of any express misrepresentation in this case.

Michigan has adopted the UCC. M.S. A. § 19.1101 et seq. Section 2–702 is found at M.S.A. § 19.2702 which reads as follows:

1. Where the seller discovers the buyer to be insolvent he may refuse delivery except for cash including payment for all goods theretofore delivered under the contract, and stop delivery under this article (section 2–705).

2. Where the seller discovers that the buyer has received goods on credit while insolvent he may reclaim the goods upon demand made within ten days after the receipt, but if misrepresentation of solvency has been made to the particular seller in writing within three months before delivery the ten-day limitation does not apply. Except as provided in this subsection the seller may not base a right to reclaim goods on the buyer's fraudulent or innocent misrepresentation of solvency or of intent to pay.

3. The seller's right to reclaim under subsection (2) is subject to the rights of a buyer in ordinary course or other good faith purchaser or lien creditor under this article. (section 2–403). Successful reclamation of

goods excludes all other remedies with respect to them.

Although Federal's insolvency on the date of delivery is disputed, the parties have agreed to reserve this factual question pending a resolution of the legal issue thus presented: whether the seller's right of reclamation under § 2–702(2) is superior to the rights of an insolvent buyer's receiver in bankruptcy.

■■ In the proceedings below, receiver sought to defeat the seller's right of reclamation by assuming the status of Federal's lien creditor as of the date of bankruptcy pursuant to § 70(c) of the Bankruptcy Act. Section 70(c) gives the trustee in bankruptcy the status of a lien creditor, as of the date of bankruptcy, whether or not there were in fact any such creditors of the bankrupt. *Lewis v. Manufacturers National Bank,* 364 U.S. 603, 81 S.Ct. 347, 5 L.Ed.2d 323 (1961). Stated another way, § 70(c) gives the trustee the status of a hypothetical lien creditor; he does not merely step into the shoes and derivatively assert the rights of an actual lien creditor. It is important to note that § 70(c) gives the trustee the status of a lien creditor but it does not define the rights of a lien creditor. Such rights must be determined by reference to the applicable state law. *In Re Mel Golde Shoes, Inc.,* 403 F.2d 658 (6th Cir. 1968); *In Re Kravitz,* 278 F.2d 820 (3rd Cir. 1960).

Applying *In Re Mel Golde Shoes, Inc., supra,* Bankruptcy Judge Brody held that the rights of a reclaiming seller as against the insolvent buyer's trustee in bankruptcy are not defined in the UCC and can only be determined by reference to pre-Code state law. *Mel Golde,* which

arose in the Western District of Kentucky, involved the competing claims of a seller and two attachment lien creditors of the insolvent purchaser. The attachments were levied one day after delivery of the goods in question. The seller demanded return of the goods within 10 days of delivery as required by § 2–702. The District Court concluded that the seller must be characterized as a creditor with an unperfected security interest and, therefore, subordinate to a lien creditor under UCC § 9–301. In reversing the District Court, the Court of Appeals followed the chain of cross references through the Code from § 2–702(2) to § 2–403 and from there to § 9–301 before concluding:

> "We do not read the quoted section of the statute [§ 9–301] as defining or throwing any light upon the 'rights' of a 'lien creditor' vis-a-vis the right of reclamation of a defrauded seller under § 355.2–702(2). This latter right is not a 'security interest' in the goods sold and Johnston & Murphy [the sellers] are not attempting to assert a 'security interest' to support their position. Thus, at the end of this circuitous statutory journey, we arrive at the conclusion that Kentucky's Commercial Code [UCC] does not contain any provision defining the relative priorities of a creditor as against a reclaiming seller. Such being the situation, we must turn to relevant common law of Kentucky for the needed answer." *Mel Golde, supra,* at 660.

Thus, in the case at bar, the Bankruptcy Judge correctly turned to Michigan pre-Code law for a determination of the rights of a lien creditor as against a reclaiming seller.[1] However, it must be

---

1. The Bankruptcy Judge expressed disagreement with the *Mel Golde* decision which requires reference to pre-Code state law for a determination of the rights of a lien creditor. Judge Brody's Opinion sets forth an explanation and analysis of the drafting history of § 2–702(3) which might indicate that the UCC drafters did not intend to set up a "circuitous statutory journey" through the

Code in search of a lien creditor's rights. It appears that the term "lien creditor" was an eleventh hour insertion in the 1952 final draft of the Code which had then been in preparation since 1945. This last minute change has created confusion and ambiguity with respect to the parenthetical cross-reference to § 2–403. Judge Brody concluded that the drafters overlooked the cross-refer-

noted that the cases cited by the Bankruptcy Judge do not satisfactorily resolve this crucial question. Neither *Heidsik v. Rechter*, 291 Mich. 708, 289 N.W. 304 (1939), nor *Elbro Knitting Mills v. Schwartz*, 30 F.2d 10 (6th Cir. 1929), involved a situation in which, as here, the buyer's trustee or receiver in bankruptcy had asserted his status as a hypothetical lien creditor in opposition to the seller's reclamation petition, and no other third-party claimants were present. Those cases concerned the rights of a reclaiming seller vis-a-vis the trustee in his capacity as the bankrupt buyer's representative, rather than as a lien creditor of the buyer. The only question in both cases was whether there was sufficient evidence to support a finding of the buyer's fraud under Michigan law, i. e., that the buyer had received the goods while insolvent and without the intention to pay for them.

Unfortunately there are no reported cases in Michigan involving the competing claims of a buyer's judicial lien creditor and a reclaiming seller. The parties have searched for such a case and this Court has also searched, but we are unable to find that the Michigan courts have ever been called upon to define these relative rights. It thus becomes the task of this Court to determine what the Michigan courts would have done if faced with this question.

The early case of *Zucker v. Karpeles*, 88 Mich. 413, 50 N.W. 373 (1891) provides a starting point inasmuch as it involved a contest between an insolvent buyer's vendor and a third-party claimant, a chattel mortgagee of the goods in question. Plaintiff Zucker had sold goods valued at $500 on credit to Karpeles who in turn mortgaged those goods to Heavenrich Bros. as security for an antecedent debt as well as for a further loan of $300. Zucker brought a replevin action alleging that Karpeles had acquired the goods by fraud. The Michigan Supreme Court found error in the trial court's jury instruction on fraud and ordered a new trial. However, much of the *Zucker* opinion was devoted to a discussion of the rights of the reclaiming seller as against the chattel mortgagee. Although this discussion is obvious dictum it is important because it subsequently became the law of Michigan through later cases. *Heenan v. Forest City Paint Co.*, 138 Mich. 548, 101 N.W. 806 (1904); *Hoffman v. Lake Shore & Michigan Southern Railway Co.*, 125 Mich. 201, 84 N.W. 55 (1900); *Cappon & Bertsch Leather Co. v. Preston National Bank*, 114 Mich. 263, 72 N. W. 180 (1897).

A creditor has a right to obtain security for the pre-existing debt, but his debtor has no right to mortgage goods not his own to secure such indebtedness. If, however, he has, for a new and valuable consideration, mortgaged goods in his possession which he has obtained under a contract of sale induced by his fraudulent practices, to a party who is ignorant of such fraud, and who acts in good faith, relying upon the ostensible ownership of the goods by the mortgagor before the defrauded vendor has rescinded the contract, such innocent mortgagee may hold the goods against the title of the defrauded vendor, upon the equitable doctrine that, where one of two innocent parties must suffer by the wrongful act or default of another, that one must suffer the loss through whose act or neglect such third party was enabled to commit the wrong. *Zucker, supra*, 88 Mich. at 430, 50 N. W. at 377.

From the distinction drawn in *Zucker* between the rights of one who takes a

---

ence when they added "lien creditor" to § 2–702(3), but had its § 9–301(3) definition in mind and intended § 2–702 to be a complete statement of the rights of a reclaiming seller as against a lien creditor, and, therefore, a buyer's trustee in bankruptcy. It also appears that the Sixth Circuit did not have the benefit of this drafting history when *Mel Golde* was decided. Were it not for the *Mel Golde* decision, this Court would find Judge Brody's analysis persuasive.

mortgage for an antecedent debt, and a mortgagee who gives fresh consideration, it seems most probable that the Michigan court would likewise have held that the rights of an attachment lien creditor, whose lien secured credit extended *after* the delivery of certain goods, were superior to a reclaiming seller whose demand for the goods followed the creditor's attachment of those goods by legal process. In such a situation the lien creditor may well have relied upon his debtor's ostensible ownership of the goods in making the loan. If his levy or attachment precedes the seller's demand for return of the goods, it is the lien creditor who has been the more diligent of the two and he should prevail. If it is argued that the lien creditor should have secured himself with a consensual device such as a chattel mortgage or the like, the same may also be said of the seller who released his goods without security.

In *Hoffman v. Lake Shore & Michigan Southern Railway Co., supra,* the Michigan Supreme Court cited *Zucker* and upheld a common carrier's possessory lien in a replevin action brought by the shipper and seller of the goods on grounds of the buyer's fraud. Although the UCC [§ 9–301(3)] and § 70c of the Bankruptcy Act both define "lien creditor" as a *judicial* lien creditor, the *Hoffman* case is nevertheless instructive.

> The plaintiffs' counsel contends that the title to the [goods] never passed to the construction company [buyer], but, as we have seen, this proposition is untenable, and, this being so, the railway company received the goods from one in whom the plaintiffs had vested title, and, as is conceded, performed services in good faith, and in reliance on the apparent ownership of the construction company. This case is not different in principle than when the fraudulent purchaser has, before rescission, mortgaged or sold the goods purchased to a *bona fide* third party. 125 Mich. 201, 205, 84 N.W. 55, 57.

In its brief submitted to the Bankruptcy Judge, Panasonic cited the case of *Schloss v. Feltus*, 96 Mich. 619, 55 N. W. 1010 (1893), rehearing 103 Mich. 525 (1895), for the proposition that defrauded sellers will generally defeat the claims of the buyer's attachment lien creditors. In that case one of the purchaser's creditors attached the goods in the hands of the buyer and the buyer then transferred his interest to another of its creditors subject to the attachment, and in satisfaction of an indebtedness incurred prior to the plaintiff's delivery of the goods. The seller brought a replevin action after the transferee had paid off the indebtedness to the attaching creditor and therefore the real contest was between the defrauded seller and the transferee for *antecedent* value. Thus, the case does not speak to the issue with which we are here concerned.

With so little guidance from the case law, it is reasonable to assume that a Michigan court faced with this question would also look to analogous provisions of the UCC. Section 2–326 is helpful in this respect. In relevant part it provides:

> (1) Unless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is
>
>> (a) a "sale on approval" if the goods are delivered primarily for use, and
>>
>> (b) a "sale or return" if the goods are delivered primarily for resale.
>
> (2) Except as provided in subsection (3), goods held on approval are not subject to the claims of the buyer's creditors until acceptance; *goods held on sale or return are subject to such claims while in the buyer's possession.*
>
> (3) Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the

person conducting the business the goods are deemed to be on sale or return. The provisions of this subsection are applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as "on consignment" or "on memorandum". However, this subsection is not applicable if the person making delivery

(a) complies with an applicable law providing for a consignor's interest or the like to be evidenced by a sign; or

(b) establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others; or

(c) complies with the filing provisions of the article on secured transactions (article 9).

(Emphasis supplied)

■ Section 2–326 represents a radical departure from pre-Code law which, despite its obvious character as a "secret lien",[2] allowed consignors to recover goods from their consignee's creditors. *Ludvigh v. American Woolen Co.*, 231 U.S. 522, 34 S.Ct. 161, 58 L.Ed. 345 (1913). But the drafters of the UCC apparently recognized the inequity of the consignor's "secret lien" and completely eliminated it in the case of goods delivered to one in the business of selling such goods. Thus, the claim of a consignor who fails to comply with the public notice requirements of UCC § 2–326(3) will be subordinate to the claim of his consignee's lien creditor. To the extent that a seller's right to reclaim under UCC § 2–702 may also be characterized as a "secret lien"[3] the same considerations should apply to his buyer's lien

creditor who extended credit to the buyer *after* delivery of the goods and perfected his lien by legal process *before* the seller's reclamation demand. It is the opinion of this Court that the Michigan courts would so hold.

It remains to be decided if Federal's receiver may assume the position of such a lien creditor and thus defeat Panasonic's claim. As has already been pointed out, Section 70c of the Bankruptcy Act gives a trustee in bankruptcy (and the receiver in these Chapter XI proceedings) the status of a hypothetical lien creditor. Under that provision the receiver is endowed with much flexibility in hypothesizing and then subrogating himself to the position of an imaginary creditor. The express language of § 70c gives the receiver the status of "a creditor who upon the date of bankruptcy obtained a lien by legal or equitable proceedings upon all property, whether or not coming into possession or control of the court, upon which a creditor of the bankrupt upon a simple contract could have obtained such a lien, whether or not such a creditor exists." Section 1(13) of the Bankruptcy Act defines "date of bankruptcy" as "the date when the petition was filed." 11 U.S.C. § 1(13).

However, § 70c does not specify when this hypothetical creditor must have extended to the bankrupt the credit which his lien secures. In *Constance v. Harvey*, 215 F.2d 571 (2nd Cir. 1954), cert. denied 348 U.S. 913, 75 S.Ct. 294, 99 L. Ed. 716 (1955), it was held that the trustee could step into the gap between the creation and perfection of a chattel mortgage and thus defeat the mortgagee even if the mortgage had been filed and perfected prior to the date of bankruptcy. But in *In Re Alikasovich*, 275 F.2d 454 (6th Cir. 1960) the Sixth Circuit

---

2. *Liebowitz v. Voiello*, 107 F.2d 914, 916 (2nd Cir. 1939).

3. Important to any characterization of a seller's rights under § 2–702 as a "secret lien" is the fact that § 2–702 embodies a standard of commercial fairness far different than the

proof of fraud upon which rescission and reclamation depended at common law. As between the reclaiming seller and a third-party claimant, the equitable considerations in favor of reclamation may be far less compelling. See discussion at pages 1364–1365, *infra*.

disagreed with the reasoning of *Constance v. Harvey* and held that the hypothetical lien creditor must be viewed to have extended the credit and secured his lien as of the date of the filing of the petition in bankruptcy. On appeal to the Supreme Court the Sixth Circuit's decision in *Alikasovich* was upheld and *Constance v. Harvey* was specifically overruled *sub nom Lewis v. Manufacturers National Bank*, 364 U.S. 603, 81 S. Ct. 347, 5 L.Ed.2d 323 (1961).

■ In this case Federal's petition in bankruptcy was filed before Panasonic's demand and thus the *Lewis* decision makes it clear that the receiver must be viewed as an "intervening" lien creditor, i. e. one who extended credit and secured his lien between delivery and demand for reclamation.[4] Because this Court has determined that the Michigan courts would have found an intervening lien creditor to have rights and equities superior to those of a reclaiming seller, Panasonic's reclamation petition in bankruptcy must be denied.

Although the foregoing determination of Michigan law is dispositive of the question in this case, the Bankruptcy Court's denial of Panasonic's reclamation petition turned upon the conclusion that UCC § 2–702(2) conflicts with two provisions of the Bankruptcy Act, and is thus unenforceable in bankruptcy. This Court will, therefore, examine that conclusion. However, it should be noted that the following analysis of the alleged conflicts necessarily assumes that a reclaiming seller would prevail as against the claim of his buyer's lien creditor under applicable state law—contrary to what this Court finds to be the law in Michigan.

After reviewing the common law of Michigan as to the proof of fraud required in support of rescission and reclamation, the Bankruptcy Court stated:

"[U]nder the Code it is not necessary to establish an intent not to pay. The Code now imports an irrebuttable presumption of fraud from the mere receipt of purchased goods while insolvent. The Official Comment to Section 2.702 states:

'Subsection (2) takes as its base line the proposition that any receipt of goods on credit by an insolvent buyer amounts to a tacit business misrepresentation of solvency and therefore is fraudulent as against the particular seller.'

Should Panasonic, therefore, establish that Federal's was insolvent within the meaning of Section 1.201(23) on the date it received the merchandise, in the absence of other defenses raised by the Receiver which will now be considered, the court would be compelled to grant the reclamation petition." Opinion, p. 14.

As defenses the receiver contended that § 2–702(2) is a state-created priority or lien which violates §§ 64 and 67(c)(1)(A) of the Bankruptcy Act. Holding that § 2–702(2) conflicts with both of these sections, the Bankruptcy Court found the presumption of fraud created by § 2–702(2) to be therefore unenforceable in bankruptcy and again turned to the common law of Michigan. Because Panasonic's stipulation of Federal's intent to pay forecloses proof of fraud under pre-Code law, the reclamation petition was denied.

Since the Bankruptcy Court's decision in this matter, the Chapter XI Arrangement has been confirmed and the business has been returned to the debtor who continues to maintain the receiver's two arguments against the validity of

---

4. Panasonic's reclamation petition was only one of 56 filed in Federal's Chapter XI proceedings. The Bankruptcy Court's opinion notes that in all but one instance the sellers' demands for reclamation occurred after the date of bankruptcy. Opinion p. 16 note 22.

In the case of a seller's demand before the date of bankruptcy the receiver would not stand as an intervening lien creditor and thus the foregoing analysis is not applicable under such circumstances.

UCC § 2–702. First, it is claimed that § 2–702 amounts to a state-created priority and is, therefore, in conflict with the specific priorities granted by Section 64 of the Bankruptcy Act. (11 U.S.C. § 104). Second, it is argued that § 2–702 is, in operation and effect, a statutory lien which first becomes effective upon the insolvency of the debtor and is thus unenforceable in bankruptcy under the express terms of Section 67(c)(1)(A) of the Bankruptcy Act. (11 U.S.C. § 107(c)(1)(A) ).

Before considering the alleged conflicts with the Bankruptcy Act it is necessary to examine the nature and extent of a seller's right of reclamation at common law, and under the UCC.

Under the common law of most states a seller of goods who could show fraud in the contract of sale was entitled to rescind the contract and recover the goods, subject only to the rights of innocent third parties. Citing, among other authorities, *Donaldson v. Farwell*, 93 U.S. 631, 23 L.Ed. 993 (1877) and *Elbro Knitting Mills v. Schwartz, supra,* Collier notes that, "The intervention of bankruptcy between bargain and rescission has not been allowed to interfere with the right to rescind and reclaim; the trustee in bankruptcy takes title to the bankrupt's property subject to the retroactive divestment effected by such a rescisson." *Collier on Bankruptcy* (14th Ed.) ¶ 70.41 at 483, [Collier].

However, while a defrauded seller had this right of rescission as against the trustee in bankruptcy, the definition of fraud was left to the applicable state law. Depending upon the jurisdiction, fraud was established upon a showing of one or more of the following acts by the buyer:

1. A misrepresentation of his financial condition, regardless of whether or not he was actually insolvent;

2. Receipt of goods while insolvent coupled with the intention not to pay for the goods;

3. Concealment or mere failure to disclose his insolvency.

See Collier, ¶ 70.41; 59 A.L.R. 418.

The common law of Michigan allowed rescission for fraud only in cases of intentional misrepresentation and receipt of goods by an insolvent without the intention to pay for them. *Heidsik v. Rechter, supra; Elbro Knitting Mills, supra.* An insolvent buyer's mere failure to disclose his insolvency to the seller did not constitute actionable fraud. *Frisbee v. Chickering*, 115 Mich. 185, 73 N.W. 112 (1897).

Now, since adoption of the UCC in virtually all jurisdictions, the state-law variations in the definition of fraud which will sustain an action for rescission and reclamation of goods have been eliminated by subsection (2) of § 2–702 which gives the seller an absolute right of reclamation from an insolvent buyer if demand is made within ten days of delivery.

Regardless of whether subsection (2) is characterized as creating a mere evidentiary presumption, or alternatively, a substantive change in the law of commercial fraud, its practical effect is clear.

Actual oral fraudulent misrepresentations, written misrepresentations before the three-month period or any other type of situation not within the express language of this section is immaterial. On the other hand, where the seller does make his demand within ten days after receipt of the goods, there is no need to show fraud or misrepresentation of any kind or in any degree. All that is necessary to prove is that the buyer received the goods on credit while insolvent (the seller delivering them without knowledge of the insolvency), and that the demand was timely made.

Collier, ¶ 70.41 at 491.

Throughout these proceedings Panasonic has argued that § 2–702 is merely a codification of the pre-existing common law right of rescission and reclama-

tion for fraud. On the basis of the foregoing comparison of the common law right with its UCC counterpart, this argument must be rejected. Unquestionably, the seller's right of reclamation has been significantly strengthened by the UCC. The debtor's brief correctly notes that, at common law, there are no reported cases which hold that the mere receipt of goods by an insolvent, without more, was a fraud entitling the seller to rescind and reclaim. Collier ¶ 70.41; 59 ALR 418. Nevertheless, such is the law under § 2–702(2) of the UCC. This is made clear by the Official Comment to § 2–702 which states:

> "Subsection (2) takes as its base line the proposition that any receipt of goods on credit by an insolvent buyer amounts to a tacit business misrepresentation of solvency and therefore is fraudulent as against the particular seller." UCC, 1972 Official Text at 177.

■ It is the conclusion of this Court, therefore, that § 2–702 must be regarded as a substantive change in the law of fraud and commercial transactions. This is not to suggest that the change is in any respect unsound. It would seem quite reasonably within the power of the state legislatures to adopt the new standard of commercial fairness which is embodied in § 2–702. But indeed it must be recognized for the change that it is: insolvent vendees must now disclose their condition or risk loss of the goods upon the mere demand of the seller made within ten days of delivery.

With this perspective as to the nature of the statutory provision in question, the Court will turn to a review of the Bankruptcy Court's conclusions regarding its conflict with the Bankruptcy Act.

Section 64 of the Bankruptcy Act establishes five classes of unsecured claims which must be paid in a bankruptcy distribution ahead of general creditors, but only after satisfaction of any and all liens which arose prior to

bankruptcy and which were not displaced by the trustee under the provisions of Sections 60, 67 or 70. The priorities established by § 64 are as follows:

1. all costs and expenses of administration of the bankrupt's estate;

2. wages and commission earned within three months before commencement of the proceedings;

3. expenses incurred by creditors in successful objection to an arrangement or discharge;

4. debts due and owing to the United States, State or local governments;

5. debts entitled to priority by the laws of the United States, and rent due a landlord who is entitled to priority under State law. 11 U.S.C. § 104.

All claims in each of these five classes are satisfied in descending order from the whole fund then remaining in the bankrupt's estate. Prior to the Bankruptcy Act of 1938, § 64 included a class for creditors holding state-law statutory priorities. Now, with the limited exception of state-law rent claims under § 64a(5), no state-created priorities are recognized in bankruptcy and such priority holders are classed as mere general creditors. As noted by Collier:

> "The most extensive change in § 64 occurred in what under the 1938 Act is the fifth and last class of prior claims: . . . Under this clause persons entitled to priorities under *state* law are no longer entitled to prior claims in bankruptcy, except in the case of rent; under the corresponding clause of the 1898 Act they were. The change was made in view of the supernumerous additions to priorities by state legislatures, often in conflict with the policy of the Bankruptcy Act."

Collier, ¶ 64.01 at 2053, 2054

> "Section 64 not only promotes equality of treatment regardless of regional

variations in the theory of priority, but it provides an important channel for congressional control at what may fairly be regarded as the primary aim of bankruptcy legislation—an equitable distribution of the debtor's assets to his creditors." *Id* at 2064.

In the case at bar, the Bankruptcy Judge correctly observed that, "The event that generally triggers the demand for reclamation is the filing of a petition in bankruptcy" and he thus found § 2–702 to be "literally and practically" a state-created priority in conflict with § 64 of the Bankruptcy Act. Opinion, p. 16.

Panasonic contends that the § 2–702 right of reclamation differs from priorities in at least three respects, and, therefore, the Bankruptcy Court erred in characterizing this right as a priority. First it is argued that while a priority is a right asserted by one creditor against all other creditors of the bankrupt, the seller's right of reclamation is asserted only against the insolvent buyer. The second distinction argued is that priorities seek to elevate a particular creditor as to all of the debtor's assets, while § 2–702 merely gives a right as to the specific goods. Panasonic's third distinction is that priorities are generally effective only upon the institution of insolvency proceedings, but the right of reclamation arises independently of such proceedings.

When viewed in the actual context of bankruptcy administration these distinctions are quite unpersuasive. It must be realized that all of a bankrupt's unsecured creditors (of which any reclaiming sellers are a part) are competing for a pro-rata share of the fund, if any, remaining after the satisfaction of all valid liens and § 64 priorities. If reclamation is permitted in bankruptcy it will reduce the bankrupt's estate at the obvious expense of all other unsecured

creditors who do not enjoy the same standing to assert their claim by accident of the fact that the value which they extended to the bankrupt was something other than goods. Thus, reclamation clearly has the effect of a priority in the distribution of the bankrupt's assets as of the date of bankruptcy. As for Panasonic's third distinction, it is, of course, recognized that a seller's rights under § 2–702 may exist independent of proceedings in bankruptcy. However, here we are only concerned with the validity of § 2–702 within the context of bankruptcy.

The events surrounding this case give credence to Judge Brody's observation that "the event which generally triggers the demand for reclamation is the filing of a petition in bankruptcy." As previously noted, a seller's rights under § 2–702(2) turn on his (1) discovery of the credit buyer's insolvency, and (2) timely demand for return of the goods. It appears that 56 reclamation petitions were filed in these proceedings and it can only be concluded that the "discovery" of Federal's insolvency occurred as a result of the publicity which attended Federal's Chapter XI petition.[5] Where, as here, the seller's demand for return of goods is made after the buyer's petition in bankruptcy, it would override common sense to hold that the seller's rights under § 2–702 arose independent of bankruptcy.

As noted above, it has long been held that the intervention of bankruptcy does not cut off the right to rescind and reclaim goods for the bankrupt's fraud. This rule is in keeping with the well established principle that, except for the displacement powers of the Act, the trustee takes the bankrupt's title subject to valid equities which would have been enforceable against it in the bankrupt's hands. *Lewis v. Manufacturers National Bank,* 364 U.S. 603, 81 S.Ct. 347, 5 L.

---

5. Judge Brody noted that in all but one of the reclamation petitions filed in this case the demand for reclamation was not made until after the filing of the petition in bankruptcy. Opinion p. 16 note 22.

Ed.2d 323 (1961). At common law the seller of goods could establish his "equities" and thus recover from the trustee by proving the fraudulent acts of the buyer. But now § 2–702(2) "eliminates the factual element of fraud and incorporates a limited conclusive right of reclamation based upon objective standards." Collier, ¶ 70.62A at 719. In this Court's view the equities which supported reclamation for fraud from the buyer's trustee at common law do not spring from the objective standards of § 2–702.

■ Thus, for all of the foregoing reasons, it must be concluded that the Bankruptcy Court correctly found § 2–702(2) to be a state-created priority in conflict with the limited provisions of § 64 of the Bankruptcy Act.

■ Turning to the second alleged conflict the Court also concludes that the Bankruptcy Court was correct in holding that, "realistically viewed", the right to reclaim under § 2–702(2) is a statutory lien which attaches only upon the insolvency of the debtor and is, therefore, invalid as to the trustee or receiver in bankruptcy by virtue of § 67c(1)(A).

Section 67c(1)(A) invalidates any state-law statutory lien which "first becomes effective" upon (1) the insolvency of the debtor, (2) distribution or liquidation of the debtor's property, or (3) execution against the debtor's property. 11 U.S.C. § 107c(1)(A). The problem is, of course, one of characterization; is the seller's right of reclamation a "statutory lien" as defined by the Bankruptcy Act, and, if so, is it of the type contemplated by § 67c(1)(A)?

Within the meaning of the Bankruptcy Act a "statutory lien" is "a lien arising solely by force of statute upon specified circumstances or conditions, but shall not include any lien provided by or dependent upon an agreement to give security, whether or not such lien is also provided by or is also dependent upon

statute and whether or not the agreement or lien is made fully effective by statute." 11 U.S.C. § 1(29a) It will be observed that the definition actually defines the term "statutory" and seems to presume an understanding of the term "lien".

It is clear that the § 2–702(2) right of reclamation arises "solely by force of statute upon specified circumstances or conditions" within the meaning of the definition. In no respect is the right either a consensual or judicial lien, both of which are specifically excluded from the definition. Petitioner stresses what might be called the "common law heritage" of § 2–702(2) and argues from this that it would be improper to characterize it as a "statutory" right. However, this argument again ignores the substantive difference between § 2–702(2) and its common law counterpart. The modern right of reclamation is indeed a statutory creation.

■ Petitioner correctly argues that while § 2–702(3) makes reclamation an exclusive remedy, a lien holder always has the right to foreclose and claim any balance between the security and the debt. But on the other hand it must be recognized that § 2–702 is a powerful and effective security device which benefits sellers to the detriment, and possible exclusion, of other creditors. In testing the validity of a state-law provision in bankruptcy, the practical effect of the statute is the paramount consideration. *Elliott v. Bumb*, 356 F.2d 749 (9th Cir. 1966), cert. denied sub nom. *Schutzbank v. Elliott*, 385 U.S. 829, 87 S.Ct. 67, 17 L.Ed.2d 66 (1966).

The legislative history of § 67c(1)(A) shows that Congress was principally concerned with disguised priorities that had been created in the image of liens, but which were in fact designed to circumvent the Chandler Act of 1938 which removed state-law priorities from § 64 of the Act.[6] As has been hereinbefore

---

6. One of the fundamental purposes of the Bankruptcy Act is to assure an equitable

distribution of the bankrupt's assets. Ideally, this would be accomplished by giving each

set forth, § 2–702 plainly operates as a priority in derogation of the scheme of distribution provided by the Bankruptcy Act. Thus, as § 2–702 operates within the context of bankruptcy, it must be viewed as essentially the type of device with which Congress was concerned when § 67c(1)(A) was enacted.

In summary, this Court affirms the Bankruptcy Court's denial of Panasonic's reclamation petition on two independent grounds. First, Michigan law does not permit a seller's recovery of goods from his buyer's lien creditor who extends credit and perfects his lien between the seller's delivery of the goods and his demand for their return. Under § 70c of the Bankruptcy Act the trustee in bankruptcy enjoys the status of such a creditor. Second, this Court is in complete accord with the Bankruptcy Court's conclusion that § 2–702(2) conflicts with the Bankruptcy Act and is, therefore, unenforceable in bankruptcy.

An appropriate order shall be submitted.

creditor a pro rata share of the estate. However, the demands of social, economic and political policy have resulted in deviations from a strict rule of equality among creditors. Through the creation of priorities and the recognition of security interests, favored treatment has been accorded to certain classes of creditors. Thus, the Bankruptcy Act has traditionally recognized that a lien is a valid property right which must be satisfied out of the assets to which it attaches before any part of those assets becomes available for distribution to unsecured creditors. Among unsecured creditors, the Act established an order of payment which favors the costs of administering the estate, wages, taxes, and rent over general creditors.

As a result of these prior payments to lien holders and priority claimants, the amount available for distribution to general creditors is considerably diminished and often entirely consumed. To increase their share of the estate, various classes of general creditors at first sought priority status under State law. However, in 1938, in the interest of national uniformity in distributions, the Chandler Act eliminated the recognition of State priorities in bankruptcy proceedings, except for a limited priority for landlords, which was placed on the lowest of the five rungs of the priority ladder erected by section 64. The act also gave explicit recognition for the first time to the general validity of statutory liens. Thus, if a class of creditors could obtain State legislation transforming their debts into liens, they would then be in a position superior not only to all other general creditors but to priority claimants as well. This would be the result not only in the case of liens creating a noncontingent property interest in a specific asset but also in the case of liens which became effective only in the event of insolvency or which did not attach to any particular asset. These spurious liens were in reality disguised priorities and the effect of their recognition in bankruptcy would be to distort the federally ordered scheme of distribution by depressing the position of priority claimants. Senate Report No. 1159, H.R.136, 1966, U.S.Code Cong. and Admin.News, pp. 2456, 2457.